IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL W. SANDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. |
| v. ) | |
| ) | 02-AR-0341-S |
| ANTHONY J. PRINCIPI, in his capacity as ) | |
| the Secretary of the U.S. Department of ) | |
| Veterans Affairs ) | |
| ) | |
| Defendant. ) | |

FILED
03 JUL 21 PH 3:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUL 21 2003

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, Anthony J. Principi ("Principi"), Secretary of the Department of Veterans Administration. Plaintiff, Michael Sanderson ("Sanderson"), a white male, alleges that Principi discriminated against him in violation of Title VII and that Principi also retaliated against him after he engaged in protected activities, *i.e.*, the filing of discrimination complaints with Equal Employment Opportunity ("EEO") counselors.

Sanderson was a staff attorney, GS-13, from August 8, 1994 to December 29, 2000. He was the only staff attorney out stationed at the Birmingham, Alabama Medical Center. On August 14, 2000, Sanderson requested informal counseling for alleged discrimination. He alleged that he was discriminated against, based upon his race (European/1/8 Indian), sex (male), color (white), and being a custodial parent, when he was given an admonishment, put on sick leave certification and assignment of duties. This complaint was investigated by Karen Greene ("Greene"), an EEO counselor. Resolution attempts during the informal counseling stage were

1



unsuccessful. On November 3, 2000, Greene completed her report detailing Sanderson's allegations and served him with a "Notice of Right to File a Discrimination Complaint." On or about November 8, 2000, Sanderson filed a formal complaint of employment discrimination.

Similarly, on October 20, 2000, Sanderson requested informal counseling for alleged discrimination because he received a notice of direct reassignment permanently reassigning him to the VA Regional Counsel Area Office in Montgomery and also on the basis of harassment and reprisal. This complaint was also investigated by Greene. Resolution attempts during the informal counseling stage were again unsuccessful. On November 20, 2000, Greene completed her report and served him with a "Notice of Right to File a Discrimination Complaint." On November 20, 2000, Sanderson filed a second complaint of discrimination on the basis of reprisal.

Finally on November 27, 2000, Sanderson requested informal counseling for alleged harassment because he received a proposed letter of removal effective on December 29, 2000, and a letter regarding improper communication and also on the basis of reprisal because he was terminated from his position as staff attorney for failure to accept the directed reassignment to Montgomery, Alabama. This complaint was investigated by Greene. Resolution attempts during the informal counseling stage were again unsuccessful. Greene completed her report and served him with a "Notice of Right to File a Discrimination Complaint." On January 8, 2001, Sanderson filed a formal complaint of discrimination.

The three formal discrimination complaints were consolidated for investigation. The claims accepted for investigation were:

> 1. Whether on the basis of color (olive), national origin (European), race (Native American), sex (male) and/or reprisal the complainant was subjected to

harassment from management officials as evidenced by one or more of the following events:

    a. On August 10, 2000, the complainant was issued a written admonishment that included AWOL charges;

    b. On August 10, 2000, the complainant was placed on "Sick Leave Certification" that required him to follow special procedures when he requested leave;

    c. The complainant believes he was assigned a heavier workload than other attorneys assigned to Regional Counsel's Office, and, when he complained about this, his supervisor responded in terms that the complainant considered demeaning, insulting and harassing.

    d. Other staff attorneys in the Office of the Regional Counsel had their positions revised, with resulting promotions to the GS-14 grade level, but this was not done for the complainant;

    e. On October 20, 2000, the complainant received written notice of his directed reassignment to the VA Regional Counsel Area Office in Montgomery, Alabama;

    f. On November 17, 2000, the complainant received a letter of counseling for engaging in improper communications, and

    g. On November 17, 2000, the complainant was issued a notice informing him that a proposal had been made to remove him from employment with the Department of Veteran Affairs.

2. Whether, on the basis of reprisal for prior EEO activity, the complainant was removed from employment with the Department of Veterans Affairs, effective December 29, 2000.

Part of Sanderson's complaint is that he was discriminated against because two white females, Betty Todd ("Todd") and Linda Dukes ("Dukes"), were promoted to GS-14 in July, 2000 and he was not promoted, despite the fact that all three received the same evaluations. Sanderson also complained that his caseload was heavier than the caseloads of Dukes and Todd. The caseload statistics for the three-year period from October 1, 1997 through October 2000, showed the following:

    In <u>Medical Malpractice</u> cases: Dukes had 4, Hague had 8, Sanderson had 17, Steven had 8, and Todd had 42.
    In <u>Personnel-EEO</u>: Dukes had 2, Hague had 20, Sanderson had 12, Stevens had 28 and Hathorne had 39.
    In <u>Personnel-MSPB</u>: Dukes had 3, Hague had 11, Sanderson had 2, Stevens had

>11 and Hathorne had 12.
>In <u>Arbitration</u>: Dukes had 1, Hague had 0, Sanderson had 2, Stevens had 0 and Hathorne had 2.
>In <u>TOTAL</u>: Dukes had 10, Hague had 39, Sanderson had 33, Stevens had 47, Hathorne had 53, and Todd had 42.
>In <u>Loan Guaranty cases</u>: Dukes had 3,864, Hague had 5, Sanderson had 0, Stevens had 0, Hathorne had 8, and Todd had 0.
>In <u>Guardianship cases</u>: Dukes had 249, Hague had 50, Sanderson had 4, Hathorne had 3 and Todd had 0.

The consolidated complaints were investigated on July 17-19, 2001. On September 5, 2001, the investigative report was issued. The Agency issued a final decision finding that Sanderson had not established unlawful discrimination by a preponderance of the evidence. This civil action was filed on February 13, 2002. Sanderson's allegations target his two former supervisors, Mary Barrett ("Barrett") and John Hague ("Hague").

Principi first says that Sanderson has failed to establish a claim of employment discrimination on the basis of sex. A plaintiff can establish a prima facie case of gender discrimination by showing: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees who are not members of the plaintiff's protected class more favorably; and (4) he was qualified for the job or job benefit at issue. *Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th Cir. 1997). Once a prima facie case is shown:

>The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity....
>... [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the

4

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255-56, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). *Rice-Lamar v. City of Ft. Lauderdale, Fla.* 232 F.3d 836, 843 (11th Cir, 2000).

Sanderson must show that he is "similarly situated in *all relevant aspects* to the non-minority employee" who was treated more favorably. *Silvera v. Orange County School Bd.,* 244 F.3d 1253 (11th Cir. 2001). For example, in the disciplinary context, "the comparator's misconduct must be *nearly identical* to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Id. (citing *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).

Sanderson's gender discrimination claim fails because he cannot show that similarly situated female employees were treated more favorably. Sanderson alleges he was discriminated against because two white females, Todd and Dukes, were promoted to GS-14 in July 2000. He also alleges that he was qualified for the GS-14 position. He maintains that he received favorable performance evaluations during the relevant time period and that in previous years he had been promoted. Principi contends that Dukes and Todd were promoted from the grade of GS-13 to the grade of GS-14 because they had met the time-in-grade requirements for promotion and they were performing their duties at the GS-13 grade but that Sanderson did not receive a promotion at that time due to his neglect of deadlines, his failure to do the work requested, and his failure to comply with the directions of his supervisors.

On April 30, 1999 Sanderson began a period of active military duty and he was placed in

5

a Leave Without Pay (LWOP) status not to exceed January 25, 2000. Sanderson returned to work in August 1999. Upon his return, he had a medical malpractice backlog of twenty to twenty-one cases. In order to assist him in becoming current in his pending medical malpractice cases, his supervisors agreed that Sanderson should concentrate on his litigation reports to the exclusion of other legal work and he was allowed to work from his home. However, during this period, his supervisors were unable to contact him by phone during work hours. When this approach did not yield the desired results Sanderson was advised to return to the office beginning September 13, 1999.

Sanderson was told that he would be limited to only working Federal Tort Claims Act claims, personnel cases and medical malpractice cases. He was further instructed that he would be expected to prepare at least two litigation reports per week in the medical malpractice cases. Sanderson's work performance continued to suffer. Sanderson's work problems failed to be resolved.

On October 28, 1999, Sanderson's supervisors were notified that he was hospitalized because of depression resulting from a personal matter. They were further advised that he would be discharged from the hospital on November 11, 1999 and could return to work without restrictions November 15, 1999. In order to provide Sanderson with the necessary supervision and assistance with his workload, he was directed to report to the Montgomery Office, beginning November 22, 1999 until further notice. Sanderson's supervisors were advised by his treating psychiatrist that Sanderson could return to work on November 15, 1999 but the drive to Montgomery would be extremely taxing for him because he was taking psychoactive drugs. His doctor recommended that he be excused from such driving requirements for a period of one

month. Sanderson's request to return to work was approved and he was also relieved of the responsibility of reporting to the Montgomery Office. However, Sanderson was advised that he: (1) needed to perform in accordance with his performance standards; (2) timely complete his current backlog of cases; (3) handle his current cases timely; (4) clock in and out by electronic mail; (5) report how he spent his time each day; (6) take responsibility for logging in the cases assigned to him; (7) concentrate on his FTCA and personnel cases; (8) not attend any administrative meetings unless his legal opinion was solicited. On April 3, 2000 he was counseled in writing regarding his (1) failure to consistently clock in and out and to provide the report of his daily activities; (2) his failure to timely communicate with his supervisor regarding his military leave; and (4) his failure to reduce his backlog of medical malpractice cases.

By memorandum dated June 1, 2000, Sanderson's supervisors established a definitive schedule for Sanderson to work on cases assigned to him. He was advised to notify his supervisors of he could not meet the schedule. On July 11, 2000 Sanderson was counseled again about his job performance. He was advised that his supervisors were close to considering disciplinary action. On July 14, 2000, Sanderson's supervisors established a definitive schedule for the prioritization of Sanderson's work assignments. On October 16, 2000 Sanderson was sent a Notice of Directed Reassignment permanently reassigning him to the Montgomery Office, effective November 15, 2000. He was given until the close of business on October 31, 2000 to either accept of decline the reassignment. Sanderson provided his supervisors with a letter from his attorney requesting some other type of solution and one from his psychiatrist that stated it was medically contraindicated at that time for Sanderson to move to or commute to Montgomery on a daily basis. Sanderson was told that the decision to remove him had been sustained.

Sanderson's employment was thereupon terminated for allegedly failing to accept the direct reassignment.

In early July 2000 GS-13 attorneys had the opportunity to be promoted to GS-14s. In October 11, 2000, on his annual performance appraisal, Sanderson received a "successful" rating on all three areas of Case Management, Client Satisfaction, and Cooperation and Organizational Support. He contends that he still did not get promoted because of his sex and in retaliation for his complaints. Sanderson was told that he would seriously be considered for promotion once he successfully completed his backlog of tort claims. However, according to his supervisors, this never happened. One of his supervisors stated the he was demonstrating early progress but the upgrade was not forthcoming because Sanderson completed only one cases in six months and was taking leave without pay and was taking AWOL.

Sanderson contends that Dukes and Todd were never subjected to the types of directives management issued to him regarding the prioritization of his caseload and clocking in and out. However, Sanderson has not produced any evidence to show that Dukes and Todd suffered from the same level of productivity problems as he did. Moreover, Sanderson contends that his caseload was heavier and that more was expected of him because he was male. The record evidence shows that Sanderson's belief that he was assigned a heavier caseload is erroneous. The caseload statistics for the three-year period from October 1, 1997 through October 2000, showed the following:

> In <u>Medical Malpractice</u> cases: Dukes had 4, Hague had 8, Sanderson had 17, Steven had 8, and Todd had 42.
> In <u>Personnel-EEO</u>: Dukes had 2, Hague had 20, Sanderson had 12, Stevens had 28 and Hathorne had 39.

8

        In <u>Personnel-MSPB</u>: Dukes had 3, Hague had 11, Sanderson had 2, Stevens had 11 and Hathorne had 12.

        In <u>Arbitration</u>: Dukes had 1, Hague had 0, Sanderson had 2, Stevens had 0 and Hathorne had 2.

        In <u>TOTAL</u>: Dukes had 10, Hague had 39, Sanderson had 33, Stevens had 47, Hathorne had 53, and Todd had 42.

        In <u>Loan Guaranty</u> cases: Dukes had 3,864, Hague had 5, Sanderson had 0, Stevens had 0, Hathorne had 8, and Todd had 0.

        In <u>Guardianship</u> cases: Dukes had 249, Hague had 50, Sanderson had 4, Hathorne had 3 and Todd had 0.

Sanderson now contends that these statistics do not accurately reflect the workload of each attorney or the amount of labor expended on different types of cases. He maintains that as early as September 9, 1999 his supervisors had knowledge that some of Sanderson's cases were not logged into the central computer system from which these statistics were generated. Defendants contend that if that is so, it is Sanderson who is at fault, since he was repeatedly counseled to properly log in his cases.

Sanderson also argues that medical malpractice cases, such as he was assigned, are more labor intensive than the sale of VA loans. Assuming *arguendo* that such assertion is true, the record reflects that for the period from October 1, 1995 to October 2000 Sanderson had 17 medical malpractice cases, Dukes had 4 and Todd had 42. During that same time period with respect to VA Loan Guaranty Cases, Dukes had 3, 864, Sanderson had none and Todd had none.

Sanderson further contends that during 1997, Dukes was granted maternity leave and was absent from the workplace for nearly five (5) months. He argues that during that time period, her workload was delegated to others, including himself. However, Sanderson argues that during the time period he was absent from work for either military leave or sick leave, his workload was not

delegated to others. These allegations are not supported by the record. According to Barrett, the female attorney was provided a computer and a fax at home and she did some work there so she would not get behind. When Sanderson returned from military leave, his supervisors also allowed him to work from home, away from the demands of the office, and he was allowed to focus solely on reducing the backlog of medical malpractice cases. However, his supervisors were unable to reach Sanderson by telephone during work hours once he began to work from home. He was then advised to return to work in the Birmingham office.

On August 10, 2000, Sanderson received an admonishment and notice of sick leave certification, which required that he follow special procedures whenever he requested leave. An amended admonishment was issued on September 8, 2000. Principi argues that the admonishment was issued for the following legitimate non-discriminatory business reasons: (1) Sanderson failed to follow instructions, (2) he failed to timely complete work assignments, and (3) he failed to notify management of leave to be taken and to properly request leave. Sanderson admits that he had files that went beyond the 180 day period within which the agency is to process a claim. He claims, however, that there were other attorneys whose claims had also gone beyond that time frame and they were never admonished. and that other attorneys, including Dukes and Todd, were treated differently than Sanderson when they requested sick leave or had a family emergency. Sanderson specifically points to an incident where he requested 40 hours of annual leave during the period of December 23-30, 1999 so he could visit his minor children who lived in different states. Rather than the 40 hours requested, he was granted 16 hours which Sanderson claims made it impossible to go to both states for visits.

The sick leave certification was issued because it was determined that Sanderson had

used 200 hours of annual leave and 186.25 hours of sick leave. Previously, Sanderson had taken about 400 hours of annual leave and sick leave, as well as military leave, leave without pay and absent without leave. Sanderson's leave balance was so depleted he was advised on several occasions that he had veery little leave left. Because of Sanderson's pending workload and the needs of the office, his supervisors approved 16 hours of annual leave during the 1999 Christmas holidays rather than the 40 hours requested by Sanderson. Prior to this request, Sanderson had been on active military duty and placed in a leave without pay status from April 30, 1999 to August 12, 1999. The sick leave certification was issued because of Sanderson's excessive absenteeism. It was in effect approximately one week before it was rescinded. It was rescinded at the recommendation of Human Resources to first discuss the issue with Sanderson then implement the sick leave certification. The admonishment was also removed from Sanderson's file in compliance with a Voluntary Settlement Agreement entered into by Sanderson and the Department of Veterans Affairs Office of General Counsel in connection with an appeal he filed to the Merit System Protections Board on or about August 17, 2000, alleging discrimination under the provisions of the Uniform Services Employment and Re-Employment Rights Act (USERRA), 38 U.S.C. §4301 *et seq*.

Sanderson's contention that he believes that he has demonstrated that Dukes and Todd were similarly situated employees is unsupported by the record. Sanderson has failed to put forth any evidence of a similarly situated employee who had excessive absenteeism, failed to follow proper procedures for requesting leave and failed to complete assignments, all of which were grounds for issuance of the sick leave certification and the admonishment. Defendants are entitled to summary judgment on Sanderson's claim of disparate treatment based upon sex.

Sanderson also brings a claim for retaliation. To succeed he must show that (1) he engaged in a statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse employment action was causally related to the plaintiff's protected activities. *See Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997). The burden then shifts to the defendants to produce a legitimate, non-retaliatory reason for the adverse employment decision and then back to Sanderson who must ultimately prove that the proffered reasons are pretext for retaliation. *E.E.O.C. v. Reichhold Chemicals*, 988 F.2d 1564, 1572 (11th Cir. 1993).

Sanderson alleges that he was retaliated against when he was not promoted to GS-14, received a notice of direct reassignment, proposed removal and was ultimately removed from employment. As previously discussed, Sanderson was not promoted because he neglected deadlines for the completion of his cases, he failed to do the work as requested, and he failed to comply with the directions of his supervisors. Sanderson alleges that Principi's claim of failure to do his work and comply with the directions of his supervisors are a pretext. However, the fact that Sanderson failed to meet deadlines, a problem that was exacerbated by his excessive absenteeism, is undisputed. As Sanderson himself asserts, he had in fact received high appraisals, was promoted, and received monetary awards "which were consistent until September of 1999, after he returned from Kosovo and began having psychiatric and medical problems." Y.C. Parris ("Parris"), Director of the Birmingham VAMC, stated that Sanderson's ability to adequately perform his job was marred by excessive absenteeism. Significantly, Parris stated that due to Sanderson's military leave, personal problems and illness, "there was an extended period of time over about three years that [Sanderson] was not here."

On March 23, 2000, Sanderson's supervisors were advised by an agent with the Federal Protective Service, General Services Administration that Sanderson was making harassing calls to his wife at her GSA office in Denver, Colorado during work hours. Sanderson's supervisors conducted a telephone conversation with Sanderson concerning these allegations. Subsequently, Sanderson's supervisors were advised that on September 11, 2000, while Sanderson was on military leave, he was suspected of sending highly inappropriate facsimile transmissions containing derogatory comments about the character of Sanderson's former wife and also a description in detail of the divorce proceedings. The fax originated from a phone number which was listed as Sanderson's military unit. On November 16, 2000 the office of General Counsel, in Washington, D.C., advised one of Sanderson's supervisors that it had received information from the GSA Federal Protective Services, the VA Inspector General, and the OPM General Counsel regarding the inappropriate facsimile. On November 17, 2000, Sanderson was counseled in writing regarding the facsimile transmissions. He was advised that sending such communications to federal employees constituted a violation of the VA Table of Examples of Offenses and Penalties, Offense 16, relating to use of insulting, abusive or obscene language to, or about, other personnel.

Sanderson contends that he is not claiming that the letter of counseling, in and of itself, was retaliation. Rather, according to Sanderson, the letter is part of a series of retaliatory actions taken by Principi after Sanderson began the EEO process. Principi argues that the letter of counseling is not an adverse employment action. The court agrees. Although Title VII's protection against retaliatory conduct extends to adverse actions which fall short of ultimate employment decisions, the decision must meet some threshold level of substantiality to be

cognizable under the anti-retaliation clause. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). In evaluating what actions meet the substantiality threshold, courts must examine the record for "objective serious and tangible actions" and be cognizant of the fact that "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Id.* at 587-88. Sanderson was merely informed that this type of communication was a violation of employee conduct and that any repetition could result in discipline. No negative employment action was taken against Sanderson; he was merely warned, not suspended, admonished or reprimanded. However, assuming *arguendo* that these actions are found to be adverse personnel actions, Principi has articulated legitimate reasons for the issuance of the letter of counseling and Sanderson has failed to show that these reasons are pretextual.

As part of the series of retaliatory events Sanderson points to a letter sent on August 29, 2000 by Barrett to Colonel Kirk Tyree, Wing Commander of Sanderson's guard unit inquiring about certain particulars of Sanderson's military duties. Such information was again requested by Barrett on October 3, 2000. Further, Barrett sent a letter dated October 13, 2000 "which referenced her instructing the Human Resources Officer to call Tyree regarding her previous letter." Defendants contend that as early as April 2000, Sanderson was counseled for failure to timely communicate with his supervisors regarding military leave and his failure to provide documentation concerning his military leave. Sanderson informed his supervisors that they could call his superiors at the Alabama Air National Guard at any time to verify whether or not he had performed military duty. On April 17, 2000, Hague spoke with Colonel Whaley of the Alabama Air National Guard in an effort to clear up discrepancies concerning Sanderson's military duty on two dates in March 2000. Sanderson's supervisors experienced continuous problems with

Sanderson regarding his inability to timely notify them of his military leave. Sanderson also describes an incident which occurred in September, 2000 wherein his supervisors sent an employee to the Birmingham VAMC to copy documents from files which reflected Sanderson's work product. Again, Sanderson ignores the fact that he had been repeatedly counseled for performance problems.

Similarly, Sanderson complains about his notice of direct reassignment to Montgomery. Sanderson was told that the reassignment was made for the purpose of supervision of his work performance. The decision to reassign Sanderson to Montgomery was management's effort to provide more supervision so that he could overcome these problems. The direct reassignment was a result of (1) Sanderson's failure to complete certain discovery requests that were te subject of a July 6, 2000 court order before Sanderson's August 17, 2000 military service; (2) his supervisor's review of his tort claim files which indicated that, in most of them, little work had been done, including specific instances when Sanderson had not followed up on inquiries; (3) and Sanderson's failure to comply with his supervisor's request to inform them as to when he was going on military leave. Sanderson has failed to create a genuine dispute of material fact that these reasons were pretext. Thus, Principi is entitled to summary judgment on Sanderson's retaliation claim.

Sanderson also brings a hostile work environment claim. It is totally devoid of merit. To establish such a claim a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a

15

discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim). The "'mere utterance of an . . . epithet which engenders offensive feelings of an employee' . . . does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated. *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65-66). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Underwood v. Northport Health Services Inc.*, 57 F. Supp 2d. 1289, 1302-03 (M.D. Al. 1999). "The racial slurs allegedly spoken by co-workers [have] to be 'so commonplace, overt, and denigrating that they create an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). In support of his hostile work environment claim, Sanderson once again points to the issuance of the admonishment, the sick leave certification, the letter of counseling for improper communication, the notice of direct reassignment and the letter of proposed removal. In addition, as further evidence of harassment, Sanderson points to the imposition of an allegedly excessive workload, allegedly demeaning supervisory comments, and the failure of management to promote him to the grade GS-14.

discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim). The "'mere utterance of an . . . epithet which engenders offensive feelings of an employee' . . . does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated. *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65-66). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Underwood v. Northport Health Services Inc.*, 57 F. Supp 2d. 1289, 1302-03 (M.D. Al. 1999). "The racial slurs allegedly spoken by co-workers [have] to be 'so commonplace, overt, and denigrating that they create an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). In support of his hostile work environment claim, Sanderson once again points to the issuance of the admonishment, the sick leave certification, the letter of counseling for improper communication, the notice of direct reassignment and the letter of proposed removal. In addition, as further evidence of harassment, Sanderson points to the imposition of an allegedly excessive workload, allegedly demeaning supervisory comments, and the failure of management to promote him to the grade GS-14.

Sanderson complains because Principi required daily clock-ins and clock-outs from him, including a detailed response as to how his time was spent each day. Principi also gave him detailed lists of how to prioritize his time and cases. Principi also requested certified military orders. Sanderson was also required to provide doctor's excuses to substantiate all of his sick leave requests and disapproved those requests when the doctor's excuse didn't meet their "standard" for sick leave. Principi also requested information from his part-time assistant regarding his whereabouts, what he was working on. One reason Principi did this was because Sanderson was the only attorney who was out-stationed. Principi had problems with Sanderson failing to timely notify his supervisors of his military leave. Sanderson had also used 200 hours of annual leave and 186.25 hours of sick leave. The sick leave certification was used to put Sanderson on notice of the requirements of requesting sick leave and not to harass him. Sanderson also claims he was assigned a heavier case load than the female attorneys. Principi offers workload statistics that show that Sanderson did not have a heavier workload that other agency attorneys and if he did have a somewhat heavier workload (always a matter of judgment) it nowhere appears to have been part of a pattern or practice of harassing males. Sanderson's response is merely a conclusory allegation that the statistics are not accurate and do not accurately reflect the workload of each attorney or the amount of labor expended on different types of cases. Sanderson's allegations are simply not sufficiently hostile or abusive to create a genuine issue of material fact regarding whether the environment to which Sanderson was subjected was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).

Principi is entitled to summary judgment on Sanderson's hostile work environment claim.

### Conclusion

By separate order, the court will grant the defendants' motion for summary judgment.

DONE this \_\_\_21st\_\_\_ day of July, 2003.

*/s/ William M. Acker, Jr.*
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE